Motions for Rehearing Overruled; Affirmed in Part and Reversed and
Remanded in Part; Opinion of January 29, 2004, Withdrawn and Substitute Opinion
filed May 6, 2004









Motions for Rehearing Overruled; Affirmed in Part and
Reversed and Remanded in Part; Opinion of January 29, 2004, Withdrawn
and Substitute Opinion filed May 6, 2004.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-00-00711-CV

____________

 

THE CHAIR
KING, INC., CHAIR KING, S.A., INC., JEROME KOSOY, M.D., M.E. FORD AND
ASSOCIATES, BEAUTIQUE, INC., DISCOVERY SERVICES OF TEXAS, INC., VANTAGE SHOE
WAREHOUSE, INC., COUNSELOR SYSTEMS, INC., POPE AND BOOTH, P.C., JEFFREY K.
MUSKER, D.C., AND POPE ESCROW COMPANY, Appellants

 

V.

 

GTE
MOBILNET OF HOUSTON, INC. AND CHICK-FIL-A, INC., Appellees

 



 

On Appeal from the 152nd District Court

Harris County, Texas

Trial Court Cause No. 95-36004

 



 

S U B S T I T U T E   O P I N I O N

We overrule the motions for
rehearing filed by appellants and by appellee GTE Mobilnet of Houston,
Inc.  We withdraw the opinion issued in
this case on January 29, 2004, and we issue the following opinion in its place.  








This is a complicated case[1]
in which we address several interesting and multi-faceted issues under the
Telephone Consumer Protection Act, 42 U.S.C. ' 227 (ATCPA@).  Appellants, plaintiffs below, challenge the
trial court=s judgment dismissing their
private damage claims under the TCPA and their common-law claims and granting
appellees/defendants=
no-evidence and traditional motions for summary judgment.  We conclude that the trial court correctly
granted summary judgment as to appellants= common-law
claims, all of their claims against appellee Chick-Fil-A, Inc. (AChick-Fil-A@), and
the TCPA claims of appellants The Chair King, Inc., Chair King, S.A., Inc.,
M.E. Ford and Associates, Vantage Shoe Warehouse, Inc., Counselor Systems,
Inc., Pope and Booth, P.C., and Pope Escrow Company.  However, we reverse the trial court=s
judgment as to the TCPA claims of appellants Jerome Kosoy, M.D., Beautique,
Inc., Discovery Services of Texas, Inc., and Jeffrey K. Musker, D.C. against
appellee GTE Mobilnet of Houston, Inc. (AGTE
Mobilnet@) and
remand these claims for further proceedings consistent with this opinion.

                              I. 
Factual and Procedural Background 

Appellants The Chair King, Inc.,
Chair King, S.A., Inc., Jerome Kosoy, M.D., M.E. Ford and Associates,
Beautique, Inc., Discovery Services of Texas, Inc., Vantage Shoe Warehouse,
Inc., Counselor Systems, Inc., Pope and Booth, P.C., Jeffrey K. Musker, D.C.,
and Pope Escrow Company (collectively referred to herein as the ARecipients@) allege
they are individuals or entities engaged in commercial, professional, or
personal matters in and around various major metropolitan areas of Texas,
including Houston, Dallas, San Antonio, and Austin.  The Recipients assert that, from as early as
1992, they have received numerous unsolicited fax advertisements on their fax
machines.








Some of the fax communications in
question were disseminated by AdverFax, a now defunct company that was formerly
in the business of sending out fax advertisements for other businesses.[2]  AdverFax targeted recipients whom it
perceived would be likely to buy its clients= products
or services and then sent advertisements or coupons via fax to these
targets.  To facilitate its operations,
AdverFax divided Houston into zones, each of which contained facsimile numbers
for that geographic area.  AdverFax
maintained a database containing fax numbers, sorted according to zone, which
enabled AdverFax=s
customers to send faxed advertisements to all of the fax numbers in any chosen
geographic zone.  With its customers=
authorization, AdverFax sent fax advertisements to the numbers in its database
pertaining to the requested zones. The summary-judgment evidence shows that
Adverfax sent out large numbers of faxed advertisements for its customers= products
and services. In 1995, the Recipients
filed suit against GTE Mobilnet in the United States District Court for the
Sourthern District of Texas (the AFederal
Suit@).  Although the Recipients named several
defendants (including GTE Mobilnet) in that suit, Chick-Fil-A was not among
them.  The United States Court of Appeals
for the Fifth Circuit ultimately determined that the federal court lacked
subject-matter jurisdiction.  See
Chair King, Inc v. Houston Cellular Corp., 131 F.3d 507, 509 (5th Cir.
1997).  The Federal Suit was then
dismissed.  








The Recipients filed this case in
Harris County District Court in 1995.  On
March 11, 1998, the Recipients added GTE Mobilnet and Chick-Fil-A (collectively
referred to herein as the AAdvertisers@) to this
case, suing Chick-Fil-A for the first time. 
The Recipients alleged that numerous fax-advertising companies
(including AdverFax) as well as the Advertisers and many other businesses who
also retained these fax-advertising companies had sent unsolicited fax
advertisements to the Recipients.[3]  The Recipients asserted the following claims:
(1) a private damage claim under the TCPA; (2) negligence; (3) negligence  per se; (4) invasion of privacy; (5) trespass
to chattels; and (6) gross negligence. 
The Recipients also alleged that the defendant advertisers had engaged
in a conspiracy with their respective fax-advertising companies to send
unsolicited fax advertisements.  

The defendants filed a joint
motion for summary judgment asserting the following grounds: 

(1)       The damages claims under the TCPA are
barred because, at the time the faxes in question were sent, Texas had not
authorized the filing of private damage claims under the TCPA in Texas courts;[4]


(2)       The TCPA does not apply to any faxes sent
solely within Texas; 

(3)       If the TCPA does apply to intrastate
faxes, then Congress lacked the power to enact the TCPA under the Commerce
Clause of the United States Constitution;

(4)       The TCPA=s minimum damages
provision violates due process under the United States and Texas Constitutions
because it is grossly disproportionate to any damage suffered by the
Recipients; 

(5)       The TCPA violates the defendants= free-speech rights under
the United States and Texas Constitutions; 

(6)       The TCPA violates the Equal Protection
Clause of the United States Constitution because it unfairly discriminates
against fax advertisements based on the content of their protected speech; 

(7)       The receipt of unsolicited fax advertisements
does not constitute an invasion of privacy; 

(8)       The Recipients do not possess any right
to privacy; 

(9)       Receipt of unsolicited fax advertisements
does not constitute a trespass to chattels; 








(10)     The conduct about which the Recipients
complain, as a matter of law, does not constitute negligence, gross negligence
or negligence per se; and 

(11)     Because all of the Recipients=
underlying claims fail, as a matter of law, their conspiracy claims also fail.  

After the trial court denied this
joint motion, GTE Mobilnet filed  a
separate motion for summary judgment and a supplemental motion asserting the
following grounds: 

(1)       GTE Mobilnet allegedly did not send the
faxes in question to the Recipients; rather they were sent by independently
owned and operated agents; 

(2)       Jerome Kosoy, M.D. is a GTE Mobilnet
customer so his consent to receive fax advertising from GTE Mobilnet is
allegedly implied; 

(3)       The Recipients= claims are barred by the
statute of limitations; 

(4)       There is no evidence GTE Mobilnet sent
unsolicited fax advertisements to any of the Recipients; and

(5)       There is no evidence to support the
essential elements of the Recipients= common-law claims.

 

Chick-Fil-A also filed an
individual motion for summary judgment and asserted the following grounds: 

(1)       The two-year statute of limitations under
section 16.003 of the Texas Civil Practice and Remedies Code bars all of the
Recipients= claims; 

(2)       Chick-Fil-A did not use its fax machines
to send faxes to the Recipients and there was no agency relationship between
Chick-Fil-A and the fax-advertising companies that sent faxes to the
Recipients; 

(3)       There is no evidence to support the
essential elements of the Recipients= common-law claims; and 

(4)       Chick-Fil-A is not liable for the actions
of its independent franchisees.

 








The Recipients filed responses to
both the joint motion for summary judgment and the individual motions, and they
also filed their own motion for a partial summary judgment relating to certain
aspects of their TCPA claims against certain defendants, including the
Advertisers.  

After granting summary-judgment
motions dismissing the Recipients= claims
against certain defendants, the trial court reconsidered its ruling on the
joint motion for summary judgment, granted the joint motion, and also granted
the individual motions for summary judgment of the remaining defendants,
including the Advertisers.  The trial
court also denied the Recipients= motion
for partial summary judgment.  Both in
the trial court and on appeal, the Recipients settled with various defendants,
so that only GTE Mobilnet and Chick-Fil-A remain as defendants/appellees in
this case.  

On appeal, the Recipients assert
the trial court erred by granting the joint motion for summary judgment and the
individual motions of GTE Mobilnet and Chick-Fil-A as well as by denying the
Recipients= motion for partial summary judgment.

                                                   II. 
Standards of Review 

In reviewing a traditional motion
for summary judgment, we take as true all evidence favorable to the non-movant,
and we make all reasonable inferences in the non-movant=s favor.
Dolcefino v. Randolph, 19 S.W.3d 906, 916 (Tex. App.CHouston
[14th Dist.] 2000, pet. denied).  If the
movant=s motion
and summary-judgment evidence facially establish its right to judgment as a
matter of law, the burden shifts to the non-movant to raise a genuine, material
fact issue sufficient to defeat summary judgment.  Id. 








In reviewing a no-evidence motion
for summary judgment, we ascertain whether the non-movant produced any evidence
of probative force to raise a genuine issue of fact as to the essential
elements attacked in the no-evidence motion.  Id. 
We take as true all evidence favorable to the non-movant, and we make
all reasonable inferences therefrom in the non-movant=s
favor.  Id.  A no-evidence motion for summary judgment
must be granted if the party opposing the motion does not respond with
competent summary-judgment evidence that raises a genuine issue of material
fact.  Id. at 917.  Because the trial court did not specify the grounds for its
ruling, we will affirm if any of the grounds advanced in the motion has
merit.  See Carr v. Brasher,
776 S.W.2d 567, 569 (Tex. 1989). 

We review the trial court=s
interpretation of applicable statutes de novo.  Johnson v. City of Fort Worth, 774
S.W.2d 653, 655B56 (Tex.
1989).  In construing federal statutes,
we look first at the language of the entire statute to determine if the
language in question has a plain and unambiguous meaning regarding the issue
before us.  See Barnhart v. Sigmon
Coal Co., 534 U.S. 438, 450, 122 S. Ct. 941, 950, 151 L. Ed. 2d 908
(2002).  The inquiry stops if the
statutory language is unambiguous and Athe
statutory scheme is coherent and consistent.@  Id. (quotations omitted).  If the relevant statutory language is
ambiguous and if no agency responsible for implementing the statute has
interpreted the language, then we seek guidance in the statutory structure,
relevant legislative history, and congressional purposes in enacting the TCPA.[5]  See Florida Power & Light Co. v.
Lorion, 470 U.S. 729, 737, 105 S. Ct. 1598, 1603, 84 L. Ed. 2d 643 (1985);
Blum v. Stenson, 465 U.S. 886, 896, 104 S. Ct. 1541, 1548, 79 L. Ed. 2d 891
(1984).  We read the words of a statute
in their context, taking note of their place in the overall statutory
scheme.  Food and Drug Admin. v. Brown
& Williamson Tobacco Corp., 529 U.S. 120, 133, 120 S. Ct. 1291, 1301,
146 L. Ed. 2d 121 (2000) (citations and quotations omitted). In doing so, we
must interpret the statute as a Asymmetrical
and coherent regulatory scheme@ and, if
possible, fit all parts into a Aharmonious
whole.@  Id. 
We must construe the language of the TCPA, if possible, so that no word
is rendered meaningless or insignificant. 
TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S. Ct. 441, 449, 151 L.
Ed. 2d 339 (2001).   








                                                                III. 
Analysis

A.        Are the Recipients= TCPA
damage claims barred because, at the time the faxes in question were sent,
Texas had not authorized the filing of damage actions under the TCPA in Texas
courts? 

One of the Advertisers= grounds
for summary judgment was that the Recipients= private
damage claims under the TCPA are barred because the TCPA requires a state to
authorize damage actions under the TCPA before these claims may be
asserted.  As noted above, Texas did not
specifically authorize the filing of these private damage claims in its courts
until September 1, 1999, and the statute containing this authorization does not
apply to the fax advertisements in question because they were sent before
September 1, 1999.  See Act of May
26, 1999, 76th Leg., R.S., ch. 635, '' 1B3, 1999
Tex. Gen. Laws 3203 (codified at Tex.
Bus. & Comm. Code ' 35.47(c)B(g)).  To frame our statutory analysis relating to
this legal issue and the other TCPA issues before the court, we begin with an
examination of the relevant language and the possible interpretations of this
federal statute.

                        1.  The Statutory Language and the Possible
Interpretations

The first summary-judgment ground
we must consider turns on the interpretation of the following statutory
language, upon which the Recipients base their TCPA damage claim:

Private right of
action.  A person or entity may, if
otherwise permitted by the laws or rules of court of a State, bring in an
appropriate court of that State C

(A) an action based on a
violation of this subsection or the regulations prescribed under this
subsection to enjoin such violation, 

(B) an action to recover
for actual monetary loss from such a violation, or to receive $500 in damages
for each such violation, whichever is 
greater, or 

(C) both such actions. 

. . . 

47 U.S.C. '
227(b)(3) (emphasis added).








In addition to providing this
private right of action under section 227(b)(3), the TCPA also authorizes any
state attorney general to bring civil actions on behalf of its state=s
residents to obtain an injunction against such unsolicited fax advertisements
and to recover the same monetary damages that may be recovered under section
227 (b)(3).  See 47 U.S.C. ''
227(b)(3) & (f)(1).  The TCPA provides
that federal district courts have exclusive jurisdiction over actions brought
by state attorneys general.  47 U.S.C. '
227(f)(2).  Finally, the TCPA also
authorizes the Federal Communications Commission (AFCC@) to
intervene as of right in any state attorney general=s
action.  See 47 U.S.C. '
227(f)(3).

Federal courts of appeals
uniformly have determined that private TCPA damage claims may be brought only
in state courts.  See Murphey v.
Lanier, 204 F.3d 911, 913B15 (9th
Cir. 2000) (agreeing with five other circuit courts of appeals that
federal courts have no jurisdiction over private damage claims under the
TCPA).  The critical language in section
227(b)(3) is Aif otherwise permitted by the laws
or rules of court of a State.@  At least three different interpretations of
this language have developed regarding the circumstances under which a claimant
may bring a TCPA damage claim in state court.  See Robert R. Biggerstaff, State Courts
and the Telephone Consumer Protection Act of 1991: Must States Opt-In? Can
States Opt-Out? 33 Conn. L. Rev.
407, 412B13
(2001).  These three interpretations,
which we refer to as Aopt-in,@ Aopt-out,@ and Aacknowledgment,@ each
produce different results when applied to the Recipients= TCPA
claims.

                                                      The
AOpt-In@
Interpretation













Under the Aopt-in@
interpretation espoused by the Advertisers, private TCPA damage claims cannot
be brought in a state=s courts
until that state=s
legislature enacts legislation or that state=s highest
court promulgates court rules that specifically permit these claims to be filed
in that state=s courts.  See Autoflex Leasing, Inc. v. Mfrs. Auto
Leasing, 16 S.W.3d 815, 817 (Tex. App.CFort
Worth 2000, pet. denied) (holding that, under plain meaning of 47 U.S.C. '
227(b)(3), TCPA damage claims cannot be asserted in a state=s court
until these claims are expressly permitted by state legislation or state court
rule and that such claims may not be brought in Texas unless the alleged
violation occurred on or after September 1, 1999, when a statute took effect
authorizing these claims).  This view has
been adopted by the only Texas court to address the issue.  However, courts from nine other states have
rejected the opt-in interpretation[6].  See Lary v. Flasch Bus. Consulting,
No. 2020803, C So. 2d C, C, 2003 WL
22463948, at *2B*5 (Ala.
Civ. App. Oct. 31, 2003) (holding that a state=s
legislative or judicial authorities need not Aopt in@ for the
state=s courts
to entertain private damage claims under the TCPA); Condon v. Office Depot,
Inc., 855 So. 2d 644, 645B48 (Fla.
Dist. Ct. App. 2003) (same); Kaufman v. ACS Sys., Inc., 2 Cal. Rptr.3d
296, 306B12 (Cal.
Ct. App. 2003) (holding TCPA provides for private damage claims in state court
unless prohibited by the state); Reynolds v. Diamond Foods & Poultry,
Inc., 79 S.W.3d 907, 908B10 (Mo.
2002) (holding state enabling legislation is not required to assert private
damage claims under the TCPA); Zelma v. Market U.S.A., 778 A.2d 591, 593B98 (N.J.
Sup. Ct. App. Div. 2001) (holding no affirmative act by legislature or highest
state court was necessary for trial court to entertain private damage claims
under the TCPA); Worsham v. Nat=l Ins.
Co., 772 A.2d 868, 871B74 (Md.
Ct. Spec. App. 2001) (stating, in context of damage action under 47 U.S.C. '
227(c)(5), which has same Aif
otherwise permitted@
language, that state courts have jurisdiction over private TCPA claims in the
absence of a state statute declining to exercise jurisdiction over TCPA
claims); Aronson v. Fax.com, Inc., 51 Pa. D. & C. 4th 421, 423B36 (Ct.
Comm. Pl. 2001) (adopting Aopt-out@ rather
than Aopt-in@
construction of  47 U.S.C. '
227(b)(3)); Hooters of Augusta, Inc. v. Nicholson, 537 S.E.2d 468, 470B71 (Ga.
Ct. App. 2000) (same as Aronson); Schulman v. Chase Manhattan Bank,
710 N.Y.S.2d 368, 370B72 (N.Y.
App. Div. 2000); see also International Science & Tech. Inst. v.
Inacom Communications, Inc., 106 F.3d 1146, 1156B58 (4th
Cir. 1997) (same as Aronson in context of finding no subject-matter
jurisdiction in federal court).  If
states do not need to affirmatively enact a statute or promulgate a court rule
allowing private TCPA damage actions for claimants to file suit in state court,
there are at least two other possible interpretations.  

                                                    The
AOpt-Out@
Interpretation    

Under a
second interpretation, states may have the ability to Aopt out@ by
passing a statute declining to entertain TCPA damage actions in that state=s courts.
 See International Science
& Tech. Inst., 106 F.3d at 1156B58; Hooters
of Augusta, Inc., 537 S.E.2d at 470B71.  This interpretation points to the concern
about a potential flood of private TCPA actions in state courts, burdening
state courts with exclusive state-court jurisdiction over a federal damage
claim that may have had no previous counterpart under state law.  See International Science &
Tech. Inst., 106 F.3d at 1158 (stating that A[i]n
creating a conditional right of action to enforce the TCPA in state courts,
Congress neither exceeded its delegated powers nor invaded the province of
state sovereignty, which still may be exercised to prohibit the action . . .
Congress enacted the TCPA to assist states where they lacked jurisdiction . . .
and it recognized state power to reject Congress= [sic]
authorization@).

                                            The AAcknowledgment@
Interpretation








Under a third interpretation,
states may not Aopt out@ because
the Supremacy Clause of the United States Constitution requires them to provide
a judicial forum for prosecution of private TCPA damage claims. Under this
interpretation, the language of the TCPA simply acknowledges the states= rights
to structure their court systems and apply neutral state-court procedural
rules.  See Schulman, 710 N.Y.S.2d
at 372 (concluding that Athe
phrase >if
otherwise permitted by the laws or rules of court of a State= merely
acknowledges the principle that states have the right to structure their own
court systems and that state courts are not obliged to change their procedural
rules to accommodate TCPA claims@);
Biggerstaff, supra, at 416B46.  To date, it does not appear that any state
has enacted a statute that explicitly refuses to allow private TCPA damage
claims in that state=s
courts.  See Biggerstaff, supra,
at 416.  The only court to date whose
holding directly contradicts the acknowledgment interpretation is R.A. Ponte
Architects, Ltd. v. Investors= Alert,
Inc.  See 815 A.2d 816, 827
(Md. App. 2003) (holding that Maryland had Aopted out@ of TCPA
damage claims by enacting in 1989 C two
years before the enactment of the TCPA C a state
statute regarding unsolicited fax advertisements without allowing for private
damage claims), cert. granted, 822 A.2d 1224 (Md. 2003); contra Condon,
855 So. 2d at 648 (holding Florida did not Aopt out@ of TCPA
by, prior to enactment of TCPA, passing statutes regulating unsolicited fax
advertisements without allowing for private damage claims); and Hooters of
Augusta, Inc., 537 S.E.2d at 471B72 (same
as Condon for Georgia). 

After scrutinizing the wording of
the TCPA, we conclude that the relevant language of this statute does not have
a plain and unambiguous meaning regarding the issues in this case.  See Barnhart, 534 U.S. at 450, 122 S.
Ct. at 950; Condon, 855 So. 2d at 647 (stating that the Aif
otherwise permitted@ language
is ambiguous); Biggerstaff, supra, at 446 (stating that Asignificant
ambiguity@ exists in the statute); but
see Autoflex Leasing, 16 S.W.3d at 817.  Having found the relevant statutory language
to be ambiguous, we now seek guidance in the relevant legislative history and
consider the congressional purposes in enacting the TCPA.  See Florida Power & Light Co., 470
U.S. at 737, 105 S. Ct. at 1603.

                                              2.  Legislative History of
the TCPA








From 1989 to 1991, Congress
considered various bills addressing the telemarketing practices made possible
by technological innovations, including the transmission of advertisements by
fax, i.e., sending the advertisement in electronic form along a telephone line
so that it is printed on paper at the receiving end.  In the process, Congress held three hearings
and produced three committee reports. The final bill combined features of three
previous bills.  Kaufman, 2 Cal.
Rptr.3d at 306B12.

In drafting the bills, Congress
became aware of several problems associated with unsolicited fax
advertisements. See Telemarketing Practices: Hearing on H.R. No. 628,
H.R. No. 2131, and H.R. No. 2184 Before the Subcomm. on Telecomms. and Fin. of
the House Comm. on Energy and Commerce, 101st Cong., 1st Sess., at 54-57
(1989) (hereinafter ATelemarketing
Practices@); H.R. Rep. No. 102-317, 1st
Sess., at 25 (1991). ASince
businesses [had] begun to express concern about the interference, interruptions
and expenses that junk fax[es] . . . placed upon them, states [were] taking
action to eliminate these telemarketing practices. [Two states had] enacted
laws banning the use of facsimile machines for unsolicited advertising.  Similar bills [were] . . .  pending in the legislatures of about half the
states.@ H.R.
Rep. No. 102-317, 1st Sess., at 25 (1991).

A[State
laws] had limited effect, however, because States do not have jurisdiction over
interstate calls.  Many States . . .
expressed a desire for Federal legislation to regulate interstate telemarketing
calls to supplement their restrictions on intrastate calls.@ Sen.
Rep. No. 102-178, 1st Sess., at 3 (1991), reprinted in 1991
U.S.C.C.A.N., at 1970. A[B]usiness
owners [were] virtually unanimous in their view that they [did] not want their
fax lines tied up by advertisers trying to send messages.@ Telemarketing
Practices, supra, at 54B55
(footnotes omitted). AExtensive
research . . . revealed no case of a company (other than those advertising via
fax) which oppose[d] legislation restricting advertising via fax.@ Id.
at 54 n.35.  As a state legislator from
Utah put it, A>You get a
message you didn=t want
from people you don=t know on
paper they didn=t buy.=@ Id.
at 54  (statement of Rep. Ken Jacobsen).








Richard Kessel, a New York state
official, spearheaded the movement to ban unsolicited fax advertisements in his
state after he was unable to fax a document to the governor=s office
which, at the time, was processing an incoming advertisement. See Telemarketing
Practices, supra, at 55.  AThe last
thing you want when you=re trying
to meet a deadline, or trying to get a memo to your boss . . . is to be
disturbed by someone trying to sell draperies or submarine sandwiches.@ Id.  In hearings held in 1991, the co-founder of
the Center for the Study of Commercialism, Michael Jacobson, described the Anumerous
nuisance faxes@ he had received and complained
that they Anot only use the recipient=s paper,
but also prevent faxes from being sent out and prevent legitimate faxes from
coming in.@ 
Hearing on Sen. No. 1462, Sen. No. 1410, and Sen. No. 857 Before the
Subcomm. on Communications of the Sen. Comm. on Commerce, Science, and Transp.,
102d Cong., 1st Sess., 41 (1991) (statement of Michael Jacobson).

The legislative counsel for the
American Civil Liberties Union, Janlori Goldman, told the House subcommittee, Awe . . .
support the . . . limits on fax machines, in terms of sending unsolicited
advertising.  We think that because of
the burden that is placed on the individual who has to pay for the cost of the
communication, that that then justifies [a] broader ban [than that placed on
telephone solicitations].@  Telemarketing/Privacy Issues: Hearing on
H.R. No. 1304 and H.R. No. 1305 Before the Subcomm. on Telecomms. and Fin. of
the House Comm. on Energy and Commerce, 102d Cong., 1st Sess., at 47.  The subcommittee was well aware that a Afestering
problem [had] arisen from the so-called >junk fax.= Junk fax
is more than merely irritating. It represents an unfair shifting of the cost of
advertising from the advertiser to the unwitting customer . . . . [U]nsolicited
and unwanted faxes can tie up a machine for hours and thwart the receipt of
legitimate and important messages.@  Id. at 3B4.








Congress recognized that,
although considered A[a]n
office oddity during the mid 1980s, the facsimile machine has become a primary
tool for business to relay instantaneously written communications and
transactions.@ 
H.R. Rep. No. 102-317, 1st Sess., 10 (1991).  By 1991, millions of offices in the United
States were sending more than thirty billion pages of information by fax each
year in an effort to speed communications and cut overnight delivery costs.  Id. 
But Athe proliferation of fax machines
has been accompanied by  explosive growth
in unsolicited facsimile advertising, or >junk fax.=@  Id. at 10.  AFacsimile
machines are designed to accept, process, and print all messages . . . The fax
advertiser takes advantage of this basic design by sending advertisements to
available fax numbers, knowing that [they] will be received and printed by the
recipient=s machine.  This type of telemarketing is problematic for
two reasons.  First, it shifts some of
the costs of advertising from the sender to the recipient.  Second, it occupies the recipient=s
facsimile machine so that it is unavailable for legitimate business messages
while processing and printing the junk fax.@  H.R. Rep. No. 102-317, supra, at
10.  A[W]hen a
facsimile machine is receiving a fax, it may require several minutes or more to
process and print the advertisement.@  Id. at 25.  AOnly the
most sophisticated and expensive facsimile machines can process and print more
than one message at a time.@  Id.

AWhen an
advertiser sends marketing material to a potential customer through regular
mail, the recipient pays nothing to receive the letter.@  Id. 
But the recipient of fax advertisements Aassumes
both the cost associated with the use of the facsimile machine and the cost of
the expensive paper used to print out facsimile messages.@  Id. 
A[T]hese
costs are borne by the recipient[s] of the fax advertisement regardless of
their interest in the product or service being advertised.@  Id.; see also Sen. Rep. No.
102-178, 1st Sess., at 2 (1991), reprinted in 1991 U.S.C.C.A.N., at
1969.

Senator Ernest Hollings of South
Carolina, the sponsor of the TCPA, in urging its passage, made the following
statements regarding the civil damage provisions of the TCPA:








The . .  . [Act] contains a private right-of-action
provision that will make it easier for consumers to recover damages from
receiving these computerized calls. The provision would allow consumers to
bring an action in State court against any entity that violates the [Act]. The
[Act] does not, because of constitutional constraints, dictate to the States
which court in each State shall be the proper venue for such an action, as this
is a matter for State legislators to determine. Nevertheless, it is my hope
that States will make it as easy as possible for consumers to bring such
actions, preferably in small claims court. . . . Small claims court or a similar
court would allow the consumer to appear before the court without an
attorney.  The amount of damages in this
legislation is set to be fair to both the consumer and the telemarketer.
However, it would defeat the purposes of the [Act] if the attorneys= costs to consumers of
bringing an action were greater than the potential damages. I thus expect that
the States will act reasonably in permitting their citizens to go to court to
enforce this [Act]. 

137 Cong. Rec. S16205B16206 (daily ed. Nov. 7,
1991) (statement of Sen. Hollings).

Congress
enacted the TCPA in November of 1991. 
The measure was signed into law on December 20, 1991. Section 227(b) of
the Act makes it Aunlawful
for any person within the United States . . . to use any telephone facsimile
machine, computer, or other device to send an unsolicited advertisement to a
telephone facsimile machine.@  47 U.S.C. '
227(b)(1)(C).  The TCPA defines Aunsolicited
advertisement@ as Aany
material advertising the commercial availability or quality of any property,
goods, or services which is transmitted to any person without that person=s prior
express invitation or permission.@  47 U.S.C. '
227(a)(4).  

                     3.  The Advertisers=
Arguments for the AOpt-In@
Interpretation

The
Advertisers assert that Texas can permit private TCPA damage claims in its
courts only by enacting legislation that specifically authorizes these
claims.  In support of this assertion,
the Advertisers argue that the following substantiates the opt-in interpretation:
(1) the Autoflex Leasing, Inc. case; (2) Senator Hollings=s
remarks; (3) dictionary definitions; (4) other instances of the use of the
phrase Aotherwise
permitted@ in the United States Code; (5)
Congress=s ability
to enact a clearer statute if it intended either the opt-out interpretation or
the acknowledgment interpretation; and (6) the legislative history of the 1999
amendment to section 35.47 of the Texas Business and Commerce Code.








The
Advertisers rely heavily on the Autoflex Leasing, Inc. case in which the
Fort Worth Court of Appeals held that the Aif
otherwise permitted@ language
unambiguously requires a state to pass legislation or promulgate court rules
allowing private TCPA damage actions before claimants may bring these claims in
a state=s
courts.  See Autoflex Leasing,
Inc., 16 S.W.3d at 817.  After
careful consideration of the language of the TCPA, the statutory structure,
relevant legislative history, and the congressional purposes in enacting the
TCPA, we respectfully disagree with the analysis of the Autoflex Leasing,
Inc. court.  See Florida Power
& Light Co., 470 U.S. at 737, 105 S. Ct. at 1603; Blum, 465 U.S.
at 896, 104 S. Ct. at 1548.  Instead, we
conclude that the relevant language of the TCPA is ambiguous.  See Condon, 855 So. 2d at 647 (stating
that the Aif otherwise permitted@ language
is ambiguous); Biggerstaff, supra, at 446 (stating that Asignificant
ambiguity@ exists in the statute); but
see Autoflex Leasing, 16 S.W.3d at 817. 
Furthermore, we do not find the federal cases cited by the Autoflex
Leasing, Inc. court persuasive in resolving this issue.

Reviewing
Senator Hollings=s
comments as a whole and in context, they do not address the issue of whether
the opt-in interpretation is correct.  Condon,
855 So. 2d at 647B48;  Zelma, 778 A.2d at 596B97.  Rather, Senator Hollings=s
comments show his concern about the bill=s silence
as to the proper state court in which claimants should bring TCPA damage claims
and his hope that the states would make their small claims courts available for
these claims so that a claimant might receive fast and efficient relief without
having to retain a lawyer.  See Zelma,
778 A.2d at 596B97; 137 Cong. Rec. S16205B16206
(daily ed. Nov. 7, 1991) (statement of Sen. Hollings).  








Dictionary
definitions do not clarify the ambiguity, but rather seem to confirm it.  For example, one dictionary defines Apermit@ as A1: to
consent to expressly or formally: grant
leave for or the privilege of: Allow, Tolerate . . . 2: to give (a person) leave: Authorize . . .@  Webster=s Third New International Dictionary 1683
(1993 ed.).  This definition seems to
favor the Advertisers=
position; however, it gives Aallow@ as a
synonym and defines Aallow@ in
pertinent part as meaning: A4: Permit . . . a: to
permit by way of concession. . . b: to
permit by neglecting to restrain or prevent . . .@  Id. at 58.  The definition of this synonym weighs against
the opt-in interpretation.  The
dictionary definitions show that the ordinary meaning of the relevant part of
the TCPA is uncertain and that the TCPA does not unambiguously require states
to expressly authorize TCPA damage claims. 


The
Advertisers also point to various federal statutes that contain the words Aotherwise
permitted@ or Apermitted@ as
support for the opt-in interpretation. 
However, the Advertisers do not cite any cases interpreting these
statutes, and we do not find that the text of these statutes alone is helpful
in interpreting the TCPA in this case.  See
Zelma, 778 A.2d at 595B96
(finding comparison of TCPA language with the language of other federal
statutes not to be helpful).  

The
Advertisers also assert that, if Congress intended to achieve the results
contemplated by the opt-out or acknowledgment interpretations, it could have
done so directly and clearly by using other language.  While this assertion is hardly debatable, it
is also true that Congress could have more directly and clearly expressed any
intent it had to require prior state authorization before allowing TCPA damage
actions in state court.  Therefore, this
argument is neither convincing nor helpful in resolving the issue.  








The
Advertisers also cite part of the legislative history for the 1999 changes to
section 35.47 of the Texas Business and Commerce Code, which states that Aeach
state must decide whether to permit its citizens to bring civil actions for
violations of the [TCPA].@  House
Research Org., Bill Analysis,
Tex. H.B. 23, 76th Leg., R.S. (1999). 
First, this legislative history is consistent with both the opt-in and
the opt-out interpretations.[7]  Second, courts construing statutory language
should give little weight to statements made by legislators after the enactment
of the statute.  In re Jane Doe,
19 S.W.3d 346, 352 (Tex. 2000).  Third,
these statements regarding the TCPA were made eight years after its enactment
by the research organization of the Texas House of Representatives, which was
not involved in passage of the TCPA by the United States Congress.  See Sullivan v. Finkelstein, 496 U.S.
617, 631, 110 S. Ct. 2658, 2667, 110 L. Ed. 2d 563 (1990) (Scalia, J.,
concurring in part) (stating that Apost-enactment
legislative history@ is an
oxymoron and should not be considered in interpreting statutes and that even
the proponents of its use limit it to statements from members of the same
legislative body that enacted the statute). 
For these reasons, we do not find this Texas legislative history
relevant or helpful in the interpretation of the TCPA. Similarly, the FCC
memorandum opinion cited by the Recipients does not weigh strongly for or
against the opt-in interpretation and does not constitute an interpretation by
the FCC of the statutory language at issue in this case.

After
scrutinizing the language of the TCPA and considering the object sought to be
obtained, the circumstances of the TCPA=s
enactment, the legislative history, and the consequences of the different
interpretations, we agree with the courts from the nine other states that have
declined to adopt the opt-in interpretation. 
See Lary, C So. 2d C, C, 2003 WL
22463948, at *2B*5; Condon,
855 So. 2d at 645B48; Kaufman,
2 Cal. Rptr.3d at 306B12; Reynolds,
79 S.W.3d at 908B10; Zelma,
778 A.2d at 593B98; Worsham,
772 A.2d at 871B74; Aronson,
51 Pa. D. & C. 4th at 423B36; Hooters
of Augusta, Inc., 537 S.E.2d at 470B71; Schulman,
710 N.Y.S.2d at 370B72.  








Congress
sought to penalize and discourage unsolicited fax advertisements because they
are an unwelcome source of annoyance, disruption, and expense to
consumers.  See Telemarketing
Practices, supra, at 54B57; H.R.
Rep. No. 102-317, 1st Sess., at 25 (1991). 
Congress intended to help states regulate and penalize unsolicited fax
advertisements by overcoming the states=
inability to regulate interstate faxes.  See
Sen. Rep. No. 102-178, 1st Sess., at 3 (1991), reprinted in 1991
U.S.C.C.A.N., at 1970.  By definition,
this meant that no state statute allowed claimants to assert a damage claim
based on unsolicited interstate faxes when the TCPA took effect.  If we were to adopt the opt-in
interpretation, that would mean that no private damage actions for unsolicited
interstate faxes could be asserted in any state unless and until that state
enacted an enabling statute.  There is no
apparent reason why Congress would structure TCPA damage actions in such an
inefficient and ineffective manner.  See
Aronson, 51 Pa. D. & C. 4th at 429 (stating that there would be no
reason why Congress would have created a statutory scheme in which it looked
exclusively to the state courts to enforce private damage actions and in which,
at the same time, Congress prevented states from entertaining these actions
until each state passed an enabling statute, even though state courts otherwise
would have been able to hear these federal claims).  We reject the opt-in interpretation.

                          4.  AOpt-Out@ Versus AAcknowledgment@
Interpretations

The
acknowledgment interpretation, which would construe the TCPA to provide an
unconditional private damage claim under federal law that must be asserted in
state court and cannot be declined, creates a troubling incongruity.  As shown below, the acknowledgment
interpretation is inconsistent with the text of the TCPA, because it would make
language in the TCPA doubly redundant.  








The
supporters of the acknowledgment interpretation argue that the Aif otherwise
permitted@ clause simply acknowledges that
states have the right to structure their own court systems and are not required
to change their neutral procedural rules to accommodate TCPA damage
claims.  See Schulman, 710
N.Y.S.2d at 370B72;
Biggerstaff, supra, at 416B46.  As courts of general jurisdiction, it is
presumed that Texas district courts have the power to adjudicate private damage
claims under federal statutes, unless the Texas Legislature or the United
States Congress provide that they do not.[8]  See U.S.
Const., art. VI, cl. 2; Tex.
Const. art. V, ' 8; Tex. Gov=t Code '' 24.007,
24.008; Dubai Petroleum Co. v. Kazi, 12 S.W.3d 71, 75 (Tex. 2000).  These principles are well-established under
this country=s federal system of government
and under the Supremacy Clause of the United States Constitution.  See Howlett v. Rose, 496 U.S. 356, 367B71, 110
S. Ct. 2430, 2438B41, 110
L. Ed. 2d 332 (1990); Dubai Petroleum Co., 12 S.W.3d at 75.  There is no requirement that anything be
stated in the federal statute for these principles to apply; as long as
Congress duly enacts a statute that it has the power to enact under the United
States Constitution, these principles are triggered and state courts of general
jurisdiction must entertain these claims unless the federal statute says
otherwise or unless neutral state procedural rules that are not preempted
prevent the assertion of a claim.  See
Howlett, 496 U.S. at 367B71, 110
S. Ct. at 2438B41.  Therefore, Congress had no need to state
these principles in the TCPA.  








Further,
the procedural matters mentioned by proponents of the acknowledgment
interpretation are generally procedural law or rules relating to matters such
as subject-matter jurisdiction, amount in controversy, or venue C all of
which simply allow the state, by its neutral procedural rules, to decide which
state court will hear the federal claim. 
See Biggerstaff, supra, at 418.  While Congress might have wanted to include a
provision in the statute that would confirm this reality, that confirmation is
already accomplished by other language in the TCPA C A[a]
person or entity may, if otherwise permitted by the laws or rules of court of a
State, bring in an appropriate court of that State . . .@  47 U.S.C. ' 227
(b)(3) (emphasis added).  This italicized
language unmistakably recognizes the constitutional realities that would apply
anyway.  It would be redundant and risk
rendering the words meaningless to interpret the Aif
otherwise provided@ clause
to have the same meaning.  See TRW
Inc. v. Andrews, 534 U.S. 19, 31, 122 S. Ct. 441, 449, 151 L. Ed. 2d 339
(2001) (stating that courts should construe the language of federal statutes,
if possible, so that no word is rendered meaningless or insignificant).  

Given the
language of the TCPA, the statute=s
purposes, the provision allowing state attorneys general to obtain the same
remedies for their citizens that are available in the private damage actions,
and Congress=s reasonable and legitimate
concern that it not overburden state court systems with potentially large
numbers of private claims, we agree with the majority view that the opt-out
interpretation is the correct one. 
Enabling legislation is not required, but a state may prohibit private
TCPA damage actions in its courts.  See
International Science & Tech. Inst., 106 F.3d at 1156B58; (explaining
purposes of TCPA and why opt-out interpretation makes sense from a policy
perspective); Lary, C So. 2d C, C &
n.2, 2003 WL 22463948, at *2B*5 &
n.2 (adopting opt-out interpretation and disapproving of acknowledgment
interpretation); Condon, 855 So. 2d at 645B48
(adopting opt-out interpretation); Kaufman, 2 Cal. Rptr.3d at 312
(holding that states can opt out of TCPA damage actions and that California has
not done so); Reynolds, 79 S.W.3d at 910 (adopting opt-out
interpretation); Worsham, 772 A.2d at 874; Aronson, 51 Pa. D.
& C. 4th at 430 (adopting opt-out interpretation); Hooters of Augusta,
Inc., 537 S.E.2d at 471 (adopting opt-out interpretation); but see
Schulman, 710 N.Y.S.2d at 372 (adopting acknowledgment interpretation); Autoflex
Leasing, 16 S.W.3d at 817 (adopting opt-in interpretation).








One
commentator who strongly supports the acknowledgment interpretation claims that
it is preferable because courts should not construe a statute to alter a
delicate constitutional balance without an explicit directive from Congress
that this was intended.  Biggerstaff, supra,
at 426B33.  The argument is that the opt-out
interpretation upsets the fragile balance of this country=s federal
system of government and threatens to undermine the Supremacy Clause.  See id.  But the federal system of government in our
country is strong, and the opt-out interpretation gives effect to what its
proponents conclude is the statutory directive from Congress under the Supremacy
Clause.  Rather than undermining the
authority of federal law, this interpretation recognizes it as the supreme law
of the land.  If Congress decides that it
is not satisfied with the results of its opt-out system for private TCPA damage
claims in state courts, our federal lawmakers are free to make these claims
mandatory in all state courts by amending the TCPA and preempting state
statutes to the contrary.[9]  For these reasons, we respectfully decline to
adopt the acknowledgment interpretation. 
Instead, we hold that the Recipients may assert TCPA damage claims as
long as Texas has not prohibited them from doing so. 

                        5.  Section 35.47 of the Texas Business and
Commerce Code

Before
the enactment of the TCPA, Texas enacted a statute regulating certain
unsolicited fax advertisements without providing for any private damage
claim.  See Act of May 23, 1989,
71st Leg., R.S., ch. 783, ' 1, 1989
Tex. Gen Laws 3469, 3469B70.  The effect, if any, of this prior statute on
the ability of the Recipients to assert TCPA damage claims is not before
us.  In their primary argument on appeal,
the Advertisers contend the trial court correctly granted summary judgment
based on the opt-in interpretation.  In
the course of this argument, the Advertisers expressly reject the opt-out
interpretation of the TCPA.  However, in
an alternative appellate argument, they assert that, as to faxes sent before
September 1, 1999, Texas has opted out of the TCPA based on the 1989 unsolicited
fax statute.  See 1989 Tex. Gen
Laws at 3469B70.  








Although
the Advertisers asserted in the trial court that there is no implied damage
action under this statute, they did not assert as a summary-judgment ground any
opt-out theory or any theory under which the 1989 unsolicited fax statute
precludes the Recipients from asserting their TCPA damage claims.  Therefore, this court cannot affirm the trial
court=s summary
judgment on any such grounds because the Advertisers did not assert them in the
trial court.  See Stiles v. Resolution
Trust Corp., 867 S.W.2d 24, 26 (Tex. 1993) (holding appellate court cannot
affirm trial court=s summary
judgment on a ground not expressly stated in motion for summary judgment).  We are limited to reviewing the ground that
the Advertisers did assert C that the
Recipients= claims are barred because Texas
did not authorize the filing of TCPA damage claims in Texas courts until
September 1, 1999.[10]  Accordingly, we conclude that the trial court
erred by granting summary judgment based on its implied ruling that the
Recipients= TCPA damage claims are barred
under the opt-in interpretation.

B.        Are the Recipients= TCPA damage claims barred
because the TCPA does not apply to intrastate faxes? 

 

The
Recipients also assert that the trial court erred by impliedly granting summary
judgment based on the Advertisers= argument
that the TCPA applies only to interstate facsimile advertisements.  The Recipients argue that the TCPA applies to
intrastate faxes  based on its plain
language.  The Recipients are correct.








The TCPA
regulates unsolicited telephone calls and fax communications.  See 47 U.S.C. '
227.  The TCPA amended the Communications
Act of 1934.  See 47 U.S.C. ' 151 et
seq.  Although the Communications Act
contains an interstate‑only restriction, the TCPA itself contained a
conforming amendment that expressly excepts the TCPA from the Communications
Act=s
interstate‑only restriction.  See
47 U.S.C. ' 152(b) (1994); Texas v. Am.
Blastfax, Inc., 121 F. Supp. 2d 1085, 1088 (W. D. Tex. 2000); Omnibus
Int=l, Inc. v. AT & T, Inc., 111
S.W.3d 818, 821B22 (Tex.
App.CDallas
2003, pet. granted, judgm=t vacated
w.r.m.); Hooters of Augusta, Inc., 537 S.E.2d at 471B72 &
n.7.  Under the TCPA, A[i]t
shall be unlawful for any person within the United States . . . to use any
telephone facsimile machine, computer, or other device to send an unsolicited
advertisement to a telephone facsimile machine.@  47 U.S.C. '
227(b)(1)(C).  The statute defines the
term Aunsolicited
advertisement@ as Aany
material advertising the commercial availability or quality of any property,
goods, or services which is transmitted to any person without that person=s prior
express invitation or permission.@  47 U.S.C. '
227(a)(4). 








Although
the TCPA does not specifically state that it covers both interstate and
intrastate faxes, section 227(b)(1)(C) applies to unsolicited faxes sent by any
person in the United States, without limiting its scope to interstate
faxes.  See 47 U.S.C. '
227(b)(1)(C).  Furthermore, in expressly
excepting the TCPA from the interstate‑only restriction of the
Communications Act, the conforming amendment evinces a congressional intent
that the TCPA apply to intrastate fax communications.  See Am. Blastfax, Inc., 121 F. Supp.
2d at 1088; Omnibus Int=l, Inc., 111
S.W.3d at 821B22; Hooters of Augusta, Inc.,
537 S.E.2d at 471 (holding Congress expressed its intent to regulate both
interstate and intrastate communications by excepting the TCPA from interstate
limitation of 47 U.S.C. '
152).  The statutory scheme of the TCPA
is coherent and consistent, and the language relevant to this issue is
unambiguous.  See Barnhart, 534
U.S. at 450, 122 S. Ct. at 950.  
Therefore, we hold that the TCPA applies to both interstate and
intrastate facsimile advertisements.  See
Am. Blastfax, Inc., 121 F. Supp. 2d at 1088; Omnibus Int=l, Inc., 111
S.W.3d at 821B22; Hooters of Augusta, Inc.,
537 S.E.2d at 471.  We find the trial
court erred in granting summary judgment based on its implied ruling that the
TCPA applies only to interstate faxes.

C.        Does the TCPA fall outside Congress=s power
under the Commerce Clause? 

The trial
court also granted summary judgment based on its implied ruling that, if the
TCPA applies to intrastate faxes, Congress lacks the power to enact the TCPA
under the Commerce Clause of the United States Constitution.








First,
Congress has authority to regulate intrastate faxes.  This is because telephones and telephone
lines C even
when used solely for intrastate purposes C are part
of an aggregate interstate system and therefore are inherent instrumentalities
of interstate commerce.  See United
States v. Weathers, 169 F.3d 336, 341 (6th Cir. 1999) (AIt is
well established that telephones, even when used intrastate, constitute
instrumentalities of interstate commerce@)
(emphasis omitted); Am. Blastfax, Inc., 121 F. Supp. 2d at
1087.  Thus, Congress may regulate purely
intrastate telephone activity to protect interstate commerce.  See United States v. Gilbert, 181 F.3d
152, 158 (1st Cir.1999) (discussing the Along
standing@ line of
cases holding Congress may regulate purely intrastate telephone activity under
the Commerce Clause); Pavlak v. Church, 727 F.2d 1425, 1427 (9th Cir.
1984) (AFederal
jurisdiction over purely intrastate communications under the Federal
Communications Act derives from Congress= plenary
power to regulate interstate commerce through regulating the means of such
commerce . . . . Since the telephone is an instrumentality of interstate
commerce, Congress has plenary power under the Constitution to regulate its use
and abuse@) (citations and quotations
omitted); see also United States v. Lopez, 514 U.S. 549, 558, 115 S. Ct.
1624, 1629, 131 L. Ed. 2d 626 (1995) (stating ACongress
is empowered to regulate and protect the instrumentalities of interstate
commerce, or persons or things in interstate commerce, even though the threat
may come only from intrastate activities@).  Congress has the requisite power to regulate
intrastate faxes and was not acting beyond its powers in enacting the
TCPA.  Indeed, to hold otherwise would
undermine well-established federal law in other areas.  See, e.g., Alley v. Miramon, 614 F.2d
1372, 1379 (5th Cir.1980) (stating A[t]his
court has consistently held that the intrastate use of the telephone may confer
jurisdiction over a private action under Section 10(b) and Rule 10b-5 [of the
federal securities laws]@).
Accordingly, we find the trial court erred in granting summary judgment based
on its implied ruling that the TCPA falls outside the power granted to Congress
in the Commerce Clause of the United States Constitution.  See Am. Blastfax, Inc., 121 F.
Supp. 2d at 1087B88
(holding Commerce Clause challenge to TCPA failed). 

D.        Does the TCPA=s minimum damage
provision violate due process under the United States and Texas Constitutions
on the ground that it is grossly disproportionate to any damage suffered by the
Recipients?

 

The trial
court also granted summary judgment based on its implied ruling that the TCPA=s minimum
damage award of $500 per fax violates due process under the Due Process Clause
of the Fifth Amendment to the United States Constitution and under the Due
Course of Law Clause of the Texas Constitution. 
See U.S. Const.
amend. V; Tex. Const. art. I, ' 16.  Given the Supremacy Clause of the United
States Constitution, it is unusual to have a federal statute challenged on
state constitutional grounds; however, the Advertisers assert that Congress
voluntarily made the Texas Constitution applicable to the TCPA by means of the
TCPA=s Aif
otherwise permitted@
language. See U.S. Const.,
art. VI, cl. 2.  For the sake of
argument, we presume the Advertisers are correct.  When, as in this case, the Advertisers have
not argued that differences in state and federal constitutional guarantees are
material to the case, and none are apparent, we limit our analysis to the Fifth
Amendment Due Process Clause and presume that its protections are congruent
with those of the Texas Constitution=s Due
Course of Law Clause.  See Bentley v.
Bunton, 94 S.W.3d 561, 579 (Tex. 2002). 









The
Advertisers contend that the $500 minimum amount of damages per TCPA violation
that a claimant may recover in a private damage action violates constitutional
due process because this minimum amount is Agrossly
disproportionate@ to any
actual harm suffered by the Recipients.  See
47 U.S.C. ' 227(b)(3).  A statutory penalty violates due process Aonly
where the penalty prescribed is so severe and oppressive as to be wholly
disproportioned to the offense and obviously unreasonable.@  St. Louis, Iron Mt. & S. Ry. Co. v.
Williams, 251 U.S. 63, 67, 40 S. Ct. 71, 73, 64 L. Ed. 139 (1919).  

The
Advertisers assert that the actual cost of receiving an unsolicited fax is two
to forty cents per fax, yet the minimum damage amount is $500 per fax.  But the TCPA damage provision was not
designed solely to compensate each private injury caused by unsolicited fax
advertisements.  It also was intended to
address and deter the overall public harm caused by such conduct.  See Am. Blastfax, Inc., 121 F. Supp.
2d at 1090.  The TCPA damage amount was
meant (1) to take into account the difficult-to-quantify business-interruption
costs imposed upon recipients of unsolicited fax advertisements; (2) to deter
the unscrupulous practice of shifting these costs to unwitting recipients of
unsolicited fax advertisements; and (3) to give an adequate incentive for an
individual claimant to bring suit on his own behalf.  See id.; Kenro, Inc. v. Fax Daily,
Inc., 962 F. Supp. 1162, 1166 (S. D. Ind. 1997). 








The
Supreme Court has stated that statutory damages designed to address such Apublic
wrongs@ need not
be Aconfined
or proportioned to [actual] loss or damages; for, as it is imposed as a
punishment for the violation of a public law, the Legislature may adjust its
amount to the public wrong rather than the private injury, just as if it were
going to the state.@  Williams, 251 U.S. at 66B67, 40 S.
Ct. at 73.  In Williams, the
Supreme Court found that the statute at issue, a fixed penalty for passenger
overcharges, did not violate due process. See id.  In explaining its ruling, the Court stated: A[w]hen
[the statute] is considered with due regard for the interests of the public,
the numberless opportunities for committing the offense, and the need for
securing uniform adherence to established passenger rates, we think it properly
cannot be said to be so severe and oppressive as to be wholly disproportioned
to the offense or obviously unreasonable.@  Id. 
The same is true here.  See Am.
Blastfax, Inc., 121 F. Supp. 2d at 1091.  

Congress
identified two legitimate public harms intended to be addressed by the TCPA=s ban on
unsolicited fax advertisements: (1) these fax advertisements can substantially
interfere with a business or residence because fax machines generally can
handle only one message at a time, to the exclusion of other messages; and (2)
unsolicited fax advertisements unfairly shift nearly all of the advertiser=s
printing costs to the recipient of the advertisement.  See Kenro, 962 F. Supp. at 1167.  The TCPA=s $500
minimum damages provision, when measured against the overall harms of
unsolicited fax advertising and the public interest in deterring this unwelcome
conduct, is not Aso severe
and oppressive as to be wholly disproportioned to the offense or obviously
unreasonable.@  See Am. Blastfax, Inc., 121
F. Supp. 2d at 1091 (holding $500 minimum damage amount under TCPA does not
violate due process); Kenro, 962 F. Supp. at 1166B67
(same); ESI Ergonomic Solutions, LLC v. United Artists Theatre Circuit, Inc.,
50 P.3d 844, 850B52 (Ariz.
Ct. App. 2002) (same); Kaufman, 2 Cal. Rptr.3d at 312 (same); Harjoe
v. Herz Fin., 108 S.W.3d 653, 654B55 (Mo.
2003) (same).  Accordingly, we find the
trial court erred in granting summary judgment based on its implied ruling that
the TCPA minimum damage amount violates constitutional due process.

E.        Does the TCPA violate the Advertisers= free-speech rights under
the United States and Texas Constitutions?

 








The trial
court also granted summary judgment based on its implied ruling that the TCPA
violated the Advertisers=
free-speech rights under the United States and Texas Constitutions.  Because the Advertisers have not shown how
the text, history, or purpose of the Texas state constitutional provision
affords them any greater protection than the First Amendment in the context of
this case, even if the Texas Constitution applied to the TCPA, we still would
apply the same analysis under the Texas Constitution and the First
Amendment.  See Bentley, 94 S.W.3d
at 578.

The
Advertisers contend the TCPA=s ban on
unsolicited fax advertisements is an impermissible regulation of commercial
speech.  See 47 U.S.C. '
227(a)(4) (defining Aunsolicited
advertisement@ as Amaterial
advertising the commercial availability or quality@ of goods
and services).  Because commercial speech
occupies a Asubordinate position in the scale
of First Amendment values,@ a
statute regulating commercial speech passes constitutional muster as long as it
directly advances a substantial governmental interest in a manner that forms a Areasonable
fit@ with the
interest.  See Board of Trustees of
State Univ., N.Y. v. Fox, 492 U.S. 469, 477B80, 109
S. Ct. 3028, 3033B35, 106
L. Ed. 2d 388 (1989).  The issue before
this court is whether the TCPA=s ban on
unsolicited fax advertisements meets this standard. 








A federal
district court in Oregon was the first to address this issue.  In Destination Ventures, Ltd. v. F.C.C.,
844 F. Supp. 632 (D. Or. 1994), aff=d 46 F.3d
54 (9th Cir. 1995), that court found Congress=s
interest in preventing cost shifting A>from the
advertiser to the unwitting customer=@ and in
preventing fax machines from being tied up by unwanted messages was a
substantial interest that is identified in the TCPA=s
legislative history.  See id. at
637 (quoting TCPA House Report).  We already
have determined that these interests are sufficiently legitimate to justify the
TCPA=s $500
per-violation minimum damages provision. 
Furthermore, as the district court in Destination Ventures
stated, Athere
were repeated, uncontradicted references made before Congress describing how
facsimile advertising shifts economic burdens from the advertiser to the
consumer . . . Congress legitimately relied upon the testimony from authorities,
as well as the contemporaneous state laws and media reports.@  Id. 
We find Congress=s
interests in passing the TCPA C
preventing Aunwitting customers@ from
bearing the brunt of advertising costs and preventing unwanted fax machine
interference C are substantial and real.  See Am. Blastfax, Inc.,
121 F. Supp. 2d at 1091B92.








Inasmuch
as Congress=s interests in preventing the
harms caused by unsolicited fax advertising are substantial and real, banning
this advertising directly advances these interests. See Destination
Ventures, 844 F. Supp. at 637 (stating that A[b]ecause
Congress has addressed a substantial interest in protecting consumers from the
economic harms inflicted through unsolicited advertisement faxes . . . the
subsequent banning of those unsolicited faxes directly advances that interest@).  Thus, the only remaining inquiry is whether
there is a Areasonable fit@ between
the TCPA=s ban on
unwanted fax advertisements and the interests directly advanced by the
ban.  See Fox, 492 U.S. at 480B81, 109
S. Ct. at 3034B35.  The district courts in Destination
Ventures, Kenro, and Am. Blastfax, Inc. considered and
rejected as alternatives allowing recipients of unsolicited fax advertisements
to place themselves on a Ado not
fax@ list as
well as placing time, length, and/or frequency limits on unsolicited fax
advertising. See Am. Blastfax, Inc., 121 F. Supp. 2d at
1092; Kenro, 962 F. Supp. at 1168B69; Destination
Ventures, 844 F. Supp. at 638B39.  We conclude there is a reasonable fit,  no more extensive than necessary, between the
TCPA=s ban on
unsolicited fax advertisements and the interests directly advanced by the
ban.  See Missouri v. Am. Blast Fax,
Inc., 323 F.3d 649, 652B59 (8th
Cir. 2003) (rejecting First Amendment challenge to TCPA ban on unsolicited fax
advertisements); Destination Ventures, Ltd. v. F.C.C., 46 F.3d 54, 56
(9th Cir.1995) (affirming district court holding that TCPA did not violate
First Amendment); Am. Blastfax, Inc., 121 F. Supp. 2d at 1091B92; Kaufman,
2 Cal. Rptr.3d at 312B323; Harjoe,
108 S.W.3d at 654B55; Kenro,
962 F. Supp. at 1167B69
(holding the mere existence of Aimaginable
alternatives@ to the TCPA does not show the
statute is improperly tailored); but see Rudgayzer & Gratt v. Enine, Inc.,
749 N.Y.S.2d 855, 857B60 (Civ.
Ct. N.Y. 2002) (adopting analysis of Missouri ex. Rel Nixon v. Am. Blast Fax,
Inc., 196 F. Supp. 2d 920 (E.D. Mo. 2002), rev=d by Am.
Blast Fax, Inc., 323 F.3d at 652B59, and
holding that TCPA violates First Amendment).

The Advertisers also argue the TCPA
violates the First Amendment because it lacks a scienter requirement for the
$500 minimum damages provision. 
Generally, only statutes imposing criminal liability for dissemination
of unprotected speech must contain a scienter element.  See New York v. Ferber, 458 U.S. 747, 765,
102 S. Ct. 3348, 3358, 73 L. Ed. 2d 1113 (1982); Smith v. California,
361 U.S. 147, 150B55, 80 S. Ct. 215, 217B19, 4 L. Ed. 2d 205 (1959).  The TCPA imposes no criminal liability.  The only case the Advertisers cite in support
of their contention that non-criminal statutes regulating commercial speech
must have a scienter requirement is an Eighth Circuit case, Video Software
Dealers Ass=n v. Webster, 968 F.2d 684 (8th Cir. 1992).  In that case, however, the court
characterized the statute at issue, which prohibited the sale or rental of
violent videos to minors, as Aquasi-criminal in nature.@  Id. at 690.  The TCPA is not a quasi-criminal statute, and
we decline to extend First Amendment jurisprudence by requiring all
non-criminal commercial speech regulations to include a scienter requirement.[11]  See Am. Blastfax, Inc., 121 F.
Supp. 2d at 1092 & n.10.  Accordingly,
we find the trial court erred in granting summary judgment based on its implied
ruling that the TCPA violates the Advertisers=
free-speech rights under the United States and Texas Constitutions.

F.        Does the TCPA violate the Equal Protection Clause of the
United States Constitution?

 








The trial
court also granted summary judgment based on its implied ruling that the TCPA
violates the Equal Protection Clause of the United States Constitution because
the statute=s ban on unsolicited fax
advertisements unfairly discriminates between commercial advertisements and
noncommercial solicitations.  The
Advertisers argued in the trial court that strict scrutiny should be applied in
evaluating this challenge because a fundamental right C freedom
of speech C is involved.[12]

We have
rejected the Advertisers= First
Amendment challenge to the TCPA=s ban on
unsolicited fax advertisements; therefore, strict scrutiny is not applicable to
the Advertisers=
equal-protection claim on the basis that a First Amendment right is involved.  See Dunagin v. City of Oxford, 718 F.2d
738, 752 (5th Cir.1983) (stating that A[i]n this
case we have held the Mississippi law entirely legal under the First Amendment,
and parties cannot insist on strict scrutiny merely by asserting a First
Amendment right that the court ultimately finds not to be violated@).  No other fundamental right or suspect class
is implicated by the Advertisers=
equal-protection challenge.  See Am. Blastfax, Inc., 121 F. Supp. 2d at
1093.  We already have determined
for First Amendment purposes that a Areasonable
fit@ exists
between the TCPA=s
identified interests and the means used to protect these interests.  This same analysis is sufficient to satisfy
the equal-protection rationality review.  See Posadas de Puerto Rico Associates v.
Tourism Co. of Puerto Rico, 478 U.S. 328, 344 n.9, 106 S. Ct. 2968, 2978
n.9, 92 L. Ed. 2d 266 (1986) (stating A[i]f
there is a sufficient >fit= between
the legislature=s means
and ends to satisfy the concerns of the First Amendment, the same >fit= is
surely adequate under the applicable >rational
basis= equal
protection analysis@).  Further, because Congress has substantial and
valid interests in protecting Aunwitting
customers@ from unsolicited fax
advertisements, the TCPA=s
distinction between commercial and noncommercial advertising is quite rational.
 See Destination Ventures, 844 F.
Supp. at 639; Am.
Blastfax, Inc., 121
F. Supp. 2d at 1093.  Therefore,
we find the trial court erred in granting summary judgment based on its implied
ruling that the TCPA violates the Equal Protection Clause of the United States
Constitution.








G.        Did  the Advertisers
conclusively prove their entitlement to judgment as a matter of law on their
statute-of-limitations defense?

 

In their
individual motions for summary judgment, both GTE Mobilnet and Chick-Fil-A
asserted the statute of limitations as a bar to the Recipients= TCPA
claims.  The main issue presented by this
challenge is whether the federal, four-year statute of limitations or state
statutes of limitations apply to private TCPA actions.  This appears to be an issue of first
impression under the TCPA.  

The
Advertisers and the Recipients agree that the Recipients=
common-law claims are governed by the two-year statute of limitations under
section 16.003(a) of the Texas Civil Practice and Remedies Code.  See Tex.
Civ. Prac. & Rem. Code '
16.003(a).  However, the Recipients
assert that the residual, federal limitations period applies to their private
claims under the TCPA.  See 28
U.S.C. ' 1658(a).


                                                                1.  Chick-Fil-A

Chick-Fil-A
asserts correctly that, as to the TCPA claims, this case involves a Areverse-Erie@
situation, in which the substantive law is federal and the procedural law is
that of Texas.  See, e.g., Exxon Corp.
v. Choo, 881 S.W.2d 301, 305B06 &
n.9 (Tex. 1994) (discussing Areverse-Erie@
situation involving a federal maritime claim in state court).  Chick-Fil-A argues in part that, in this
reverse-Erie situation, the Texas limitations period applies
because  statutes of limitations are
procedural and Texas law supplies the procedure.  To support its position, Chick-Fil-A cites to
Hill v. Perel, 923 S.W.2d 636, 639 (Tex. App.CHouston
[1st Dist.] 1995, no writ), a case holding that limitations is generally
procedural in a case in a Texas court in which the substantive law of another
state applies.  As applied to the TCPA,
Chick-Fil-A=s argument lacks merit for two
reasons.  








First, if
Congress has enacted a statute that requires a four-year limitations period for
the federal claim asserted in this case, then that federal law would preempt
any contrary state-law analysis.  See
Anderson v. Diamond M-Odeco, Inc., 912 S.W.2d 371, 372B73 (Tex.
App.CHouston
[14th Dist.] 1995, writ dism=d by
agr.) (holding three-year maritime-tort statute of limitations under 46 U.S.C. ' 763a
applies to maritime torts filed in state court). 








Second,
this argument fails to recognize a historical difference between limitations
rules in two different contexts: (1) Erie and reverse-Erie
situations, and (2) situations in which Texas courts apply the substantive law
of a foreign jurisdiction, which does not include federal law.  When Texas courts apply foreign law from
another state or country, the rule has been that the foreign jurisdiction
supplies the substantive law, and Texas supplies the procedural law, and this
procedural law has been held to include the statute of limitations, unless the
statute that created the claim contains an express limitations period.  See Hill, 923 S.W.2d at 639.  However, in Erie and reverse-Erie
situations, courts have determined that, rather than decide the potentially
difficult issue of whether limitations is procedural or substantive, the rule
should simply be that the limitations period comes from the same source as the
substantive law.  See Guaranty Trust
Co. of N.Y. v. York, 326 U.S. 99, 108B11, 65 S.
Ct. 1464, 1469B71, 89 L. Ed. 2079 (1945)
(holding that, in Erie situation C
diversity claim in federal court C regardless
of whether statutes of limitations are procedural or substantive, state
statutes of limitations apply to maintain uniformity of outcomes among similar
claims, regardless of whether they are brought in state court or federal
court); Engel v. Davenport, 271 U.S. 33, 39, 46 S. Ct. 410, 413, 70 L.
Ed. 813 (1926) (holding that limitations period in federal statute that
governed personal-injury claim applied to state-court claim under that statute
rather than state limitations period). 
This difference in the law has been diminished somewhat by the Texas
Legislature=s fairly recent enactment of a
statute adopting the foreign state or country=s statute
of limitations for personal-injury or death claims under foreign law in Texas
courts, if the claimant is not a resident of Texas.  See Act of May 27, 1997, 75th Leg.,
R.S., ch. 424, ' 3, 1999
Tex. Gen Laws 1680, 1683 (codified at Tex
Civ. Prac. & Rem Code ' 71.031
(a)(3)).  In any event, even if we were
to conclude that statutes of limitations are Aprocedural,@ that
would not answer the question now before us. 
Instead, we must interpret and apply the federal statute the Recipients
claim governs this case.  That statute
states:

Except as otherwise
provided by law, a civil action arising under an Act of Congress enacted after
the date of the enactment of this section may not be commenced later than 4
years after the cause of action accrues.

28 U.S.C. ' 1658(a). 

 

The
Recipients= TCPA claims arise under an act
of Congress, the TCPA.  Congress enacted
the TCPA after it enacted section 1658(a). 
See 47 U.S.C.A. ' 227; 28
U.S.C.A. 1658.  Therefore, the four-year
statute of limitations in section 1658(a) applies to the TCPA claims unless
another law provides otherwise.  See
28 U.S.C. ' 1658(a).  

Chick-Fil-A
asserts that another law C 47
U.S.C. '
227(b)(3) C does provide otherwise because
that statute specifies that private damage claims may be brought in state court
Aif
otherwise permitted by the laws or rules of court of a State.@  47 U.S.C. '
227(b)(3).  This is a difficult issue and
one of apparent first impression in the United States.  After careful study and examination, we agree
with Chick-Fil-A=s
position. Under the opt-out interpretation of section 227(b)(3) that we now
have adopted, parties may assert private TCPA claims in an appropriate state
court if state law permits.  Therefore,
if Texas limitations law does not permit the Recipients to pursue their claims
against Chick-Fil-A, then the Recipients= claims
are not Aotherwise
permitted@ by Texas law.  








Though
Congress could have enacted a TCPA private damage claim with a four-year
federal limitations period, our federal lawmakers had the flexibility and
discretion to enact a statute that allows states to exercise control over these
federal claims in the state-court system. 
In this way, if these claims are not a burden on the state=s
judicial system, then the state need not take any action.  Conversely, if the TCPA claims start to
become a burden on the state-court system, either due to unmanageable
quantities or because of increased scarcity of resources in the state=s
judicial system, then the TCPA allows states to take responsive action either
by closing their courts to these claims or by shortening the limitations period
to reduce the number of claims its judicial system must handle.  State attorneys general still would be able
to obtain the same relief in federal court, and this might be a more efficient
arrangement in the judgment of some states. 
Given the TCPA=s
language, the congressional purposes in enacting it, and the statute=s
legislative history, we cannot conclude that Congress intended to force the
states to hear these private TCPA claims with a long four-year limitations
period, when many states have a one-year or two-year limitations period for
tort claims.  See International
Science & Tech. Inst., 106 F.3d at 1157 (stating that Aconcerned
over the potential impact of private actions on the administration of state
courts, Congress included a provision to allow the states to prohibit private
TCPA actions in their courts.  We have no
doubt that Congress has a legitimate interest in not overburdening state and
federal courts [or] that Congress has a legitimate interest in respecting the
states=
judgments about when their courts are overburdened@).  Therefore, we conclude that the residual
four-year federal limitations statute does not apply to private TCPA claims.








Under
Texas law, if the Texas Supreme Court has not held that a tort is governed
by  a statute of limitations other than
section 16.003(a) of the Texas Civil Practice and Remedies Code and if that
tort is not expressly covered by a statute of limitations, then we presume the
tort is a Atrespass@ that is
covered by the two-year statute of limitations of section 16.003(a).  See Tex.
Civ. Prac. & Rem. Code '
16.003(a); Williams v. Khalaf, 802 S.W.2d 651, 654 (Tex. 1990); Almazan
v. United Services Automobile Assoc., 840 S.W.2d 776, 779B80 (Tex.
App.CSan Antonio
1992, writ denied) (applying Khalaf presumption regarding section
16.003(a) to statutory tort based on wrongful dismissal for filing workers=
compensation claim).  The Recipients= private
TCPA claims are tort claims.  Further,
because the Texas Supreme Court has not held that private TCPA claims are
governed by a statute of limitations other than section 16.003(a) and because
such claims are not expressly covered by a statute of limitations, we presume
that  private TCPA claims are covered by
section 16.003(a).  See Tex. Civ. Prac. & Rem. Code '
16.003(a); Williams, 802 S.W.2d at 654; Almazan, 840 S.W.2d at
779B80.  This presumption has not been overcome.  We conclude that the Recipients= private
TCPA claims are covered by the language of section 16.003(a)=s
two-year statute of limitations.  See
Tex. Civ. Prac. & Rem. Code '
16.003(a) (stating that two-year statute of limitations covers, among other
things, Atrespass
for injury to the estate or to the property of another, conversion of personal
property, taking or detaining the personal property of another, personal injury
. . . .@); Almazan,
840 S.W.2d at 779B80
(holding statutory tort based on wrongful dismissal for filing workers=
compensation claim is governed by section 16.003(a)=s
two-year statute of limitations rather than by the residual four-your statute
of limitations); Collins v. Collins, 904 S.W.2d 792, 804 (Tex. App.CHouston
[1st Dist.] 1995) (holding claim under Texas wiretap statute is governed by
section 16.003(a)=s
two-year statute of limitations rather than by the residual four-your statute
of limitations) (en banc), writ denied, 923 S.W.2d 569 (Tex. 1996).  Thus, we evaluate the  timeliness of the Recipients= TCPA
claims by calculating whether they were brought within two years of accrual. 








The type
of TCPA claim asserted by the Recipients accrues when the defendant sends an
unsolicited advertisement to the plaintiff=s fax
machine.  See 47 U.S.C. ' 227
(b)(1)(C), (b)(3). The parties do not dispute that the Recipients sued
Chick-Fil-A for the first time on March 11, 1998.  The Recipients have not cited, and this court
has not found, any summary-judgment evidence raising a genuine issue of
material fact as to whether the Recipients received any fax advertisement from
Chick-Fil-A on or after March 11, 1996.  The
only evidence on this point shows that all of the fax advertisements
Chick-Fil-A allegedly sent to the Recipients were sent before March 11, 1996,
which is more than two years before the Recipients filed suit against
Chick-Fil-A.  Accordingly, we conclude
that the trial court acted correctly in granting Chick-Fil-A=s motion
for summary judgment based on limitations, and we overrule the Recipients= issue on
appeal to the extent that it challenges the take-nothing judgment in favor of
Chick-Fil-A.  

                                                              2.  GTE Mobilnet

GTE
Mobilnet also moved for summary judgment on the ground that the statute of
limitations barred the Recipients= TCPA
claims.  However, the record shows that
the Recipients= action against GTE Mobilnet (the
Federal Suit) was dismissed for lack of jurisdiction on January 12, 1998, and
that the Recipients brought suit against GTE Mobilnet in this case 58 days
later, on March 11, 1998.  Therefore,
under Texas limitations law, the date of filing as to the claims against GTE
Mobilnet relates back to April 12, 1995 C the date
the Recipients filed the Federal Suit against GTE Mobilnet.  See Tex.
Civ. Prac. & Rem. Code '
16.064.  None of the fax advertisements
in the record on which the Recipients base their claims against GTE Mobilnet
were sent before April 12, 1993. 
Therefore, the trial court erred in granting summary judgment based on
its implied ruling that the Recipients= claims
against GTE Mobilnet were barred by limitations.

H.        Did the trial court err by granting GTE
Mobilnet summary judgment based on its assertion that independently owned and
operated agents, rather than GTE Mobilnet, sent the faxes in question?








The trial
court also granted summary judgment based on its implied ruling that GTE
Mobilnet=s
independently owned and operated agents, rather than GTE Mobilnet, sent the GTE
Mobilnet fax advertisements.  In support
of GTE Mobilnet=s motion
for summary judgment, Jeffrey L. Sicard testified by affidavit that he is a
general manager for GTE Mobilnet and that the fax advertisements in question
relating to GTE Mobilnet Awere not
sent by GTE Mobilnet of Houston, Inc., but were sent by independently owned and
operated agents.@  Applying the familiar standards of review for
summary judgment, this affidavit by itself raised a genuine issue of material
fact as to whether GTE Mobilnet used any telephone facsimile machine, computer,
or other device to send an unsolicited advertisement to one or more of the
Recipients.  








The TCPA
does not require that GTE Mobilnet or its employees be the ones to actually send
unsolicited fax advertisements for liability to attach.  See Hooters of Augusta, Inc.,
537 S.E.2d at 472; see also Worsham, 772 A.2d 868, 877B79
(stating, in context of damage action under 47 U.S.C. '
227(c)(5), that under TCPA, defendant still can be liable, even if independent
contractor made the call on defendant=s
behalf).  Under the TCPA, Athe entity
or entities on whose behalf facsimiles are transmitted are ultimately liable
for compliance with the [TCPA=s] rule
banning unsolicited facsimile advertisements.@  In the Matter of Rules and Regulations
Implementing the Telephone Consumer Protection Act of 1991, FCC Release No.
95-310, 10 F.C.C. Rcd. 12391, 12407 (Aug. 7, 1995).  Parties wishing to send unsolicited fax
advertisements in violation of the TCPA should not be able to avoid liability
simply by having the transmission executed by an independent contractor.  Hooters of Augusta, Inc., 537 S.E.2d at
472.  A reasonable inference from Sicard=s
affidavit would be that GTE Mobilnet and its employees did not send the faxes
in question but that one of GTE Mobilnet=s
independent agents sent these faxes. See Dolcefino, 19 S.W.3d at
916.  Therefore, we conclude that there
is a genuine issue of material fact as to whether the fax advertisements in
question were sent by someone acting on behalf of GTE Mobilnet.  See Worsham, 772 A.2d at 878B79
(finding fact issue under TCPA as to whether phone calls were made on behalf of
defendant).[13]  Accordingly, we conclude the trial court
erred to the extent that it impliedly ruled that GTE Mobilnet was entitled to
summary judgment based on its assertion that independently owned and operated
agents, rather than GTE Mobilnet, sent the GTE Mobilnet fax advertisements. 

I.          Did the Recipients raise a genuine
issue of material fact in response to GTE Mobilnet=s
assertion that there is no evidence GTE Mobilnet sent unsolicited fax
advertisements to any of the Recipients?

GTE
Mobilnet filed no-evidence motions for summary judgment directed to the claims
of certain of the Recipients.  We now
consider the propriety of the trial court=s implied
rulings granting these motions.

1.         The Chair King, Inc., Chair King, S.A.,
Inc., M.E. Ford and Associates, Vantage Shoe Warehouse, Inc., Counselor
Systems, Inc., Pope and Booth, P.C., and Pope Escrow Company

The
following parties did not adduce any summary-judgment evidence showing that they
received any fax advertisements from GTE Mobilnet:  The Chair King, Inc., Chair King, S.A., Inc.,
M.E. Ford and Associates, Vantage Shoe Warehouse, Inc., Counselor Systems,
Inc., Pope and Booth, P.C., and Pope Escrow Company.  Based on these parties= failure
to raise a genuine issue of material fact as to whether they received any
unsolicited fax advertisement from GTE Mobilnet, we conclude that the trial
court properly granted summary judgment as to all of these parties= claims
against GTE Mobilnet.

2.  Jerome Kosoy, M.D., Beautique, Inc.,
Discovery Services of Texas, Inc., 

and Jeffrey K. Musker,
D.C.

 








As to
Jerome Kosoy, M.D., Beautique, Inc., Discovery Services of Texas, Inc., and
Jeffrey K. Musker, D.C., we conclude that these four parties raised genuine
issues of material fact as to whether GTE Mobilnet sent them unsolicited fax
advertisements.  In their affidavits,
these parties asserted that the fax advertisements appended as attachments
(which include advertisements for GTE Mobilnet) were sent to them by the
defendants, a group that includes GTE Mobilnet. 
This evidence and the first affidavit of Jeffrey Sicard (discussed in
section H., above) raise a genuine issue of material fact as to the elements of
these parties= private TCPA claims.  Therefore, the trial court erred to the
extent it granted summary judgment as to the TCPA claims of Jerome Kosoy, M.D.,
Beautique, Inc., Discovery Services of Texas, Inc., and Jeffrey K. Musker, D.C.

                                                         3.  Jerome Kosoy, M.D.








As an
additional ground for summary judgment as to Jerome Kosoy, M.D.=s claims,
GTE Mobilnet asserted that it presumptively had permission to send him fax
advertisements  because it was not
disputed that, at all relevant times, Kosoy was a customer of GTE Mobilnet.  The TCPA prohibits sending fax advertisements
to a person without that person=s Aprior
express invitation or permission.@  See 47 U.S.C. ''
227(a)(4) and (b)(1)(C).  The FCC has
stated that Afacsimile transmission [sic] from
persons or entities who have an established business relationship with the
recipient can be deemed to be invited or permitted by the recipient.@  See 7 F.C.C.R. 8752, n.87, 1992 WL 690928
(1992).  This notion of deeming
permission is based on an inference and, as such, seems to conflict with the
TCPA=s
requirement that the invitation or permission be express.  See 47 U.S.C. ''
227(a)(4).  Characterizing permission
granted by implication as Aexpress@ runs
afoul of the plain meaning of the word. 
Generally, Aexpress@ means Aclearly
and unmistakably communicated; directly stated.@  Black=s Law Dictionary 601 (7th ed. 1999); see also
Lehmann v. Har‑Con Corp., 39 S.W.3d 191, 192B93, 200,
205B06 (Tex.
2001) (equating Aexpress@ with Astates
with unmistakable clarity@ and with
Aclearly
and unequivocally states@).  Kosoy testified that he did not give prior
express invitation or permission to the defendants (which includes GTE
Mobilnet) to send the fax advertisements attached to his affidavit.  Kosoy testified he did not want to receive
these unsolicited fax advertisements and that he did not give prior express
invitation or permission to GTE Mobilnet to send them.  Under the applicable standard of review, we
find that Kosoy raised a genuine issue of material fact as to whether he gave
prior express invitation or permission.  

J.         Did the Recipients raise a genuine
issue of material fact in response to GTE Mobilnet=s
assertion that there is no evidence to support their common-law claims against
GTE Mobilnet?

In
addition to granting summary judgment on the Recipients= TCPA
claims, the trial court also granted summary judgment in favor of GTE Mobilnet
on the Recipients=
common-law claims.  We now consider the
Recipients= challenges to these rulings.

                                                          1.  Invasion of Privacy

As to the
intrusion-upon-seclusion invasion-of-privacy claims, we conclude that the trial
court properly granted summary judgment as to the claims of Jerome Kosoy, M.D.,
Beautique, Inc., Discovery Services of Texas, Inc., and Jeffrey K. Musker, D.C.
against GTE Mobilnet.  Certainly, sending
unauthorized fax advertising may constitute invasion of privacy in some
circumstances.  See International
Science & Tech. Inst., 106 F.3d at 1150 (discussing legislative
history of TCPA that states TCPA seeks to protect the privacy interests of
residential telephone subscribers by restricting unsolicited phone and fax
calls).  However, as to Beautique, Inc.
and Discovery Services of Texas, Inc., there is no Texas authority recognizing
a corporation=s right to solitude, seclusion,
or privacy, and we decline to recognize one here.  See Express One Int=l, Inc.
v. Steinbeck, 53 S.W.3d 895, 900 (Tex. App.CDallas
2001, no pet.) (stating no Texas authority recognizes a corporation=s right
to privacy).  








Further,
the two elements of this claim are: (1) an intentional intrusion, physically or
otherwise, upon another=s
solitude, seclusion, or private affairs or concerns, (2) that would be highly
offensive to a reasonable person.  Valenzuela
v. Aquino, 853 S.W.2d 512, 513 (Tex. 1993). 
The summary-judgment evidence does not raise a genuine issue of material
fact on either element for the claims of the individual claimants Jerome Kosoy,
M.D. and Jeffrey K. Musker, D.C. 
According to Kosoy=s
affidavit, the address at which his fax machine is located contains a suite
number, indicating an office address.  In
any event, neither claimant describes the circumstances surrounding his receipt
of the fax advertisements in question. 
Neither describes the location of the fax machine or the expectation of
solitude, seclusion, or privacy that he claims relating to this fax
machine.  Both failed to provide details
regarding the facts that might bear on the offensiveness of GTE Mobilnet=s alleged
conduct. 

            On
this record, we conclude the trial court correctly granted summary judgment
against these four claimants regarding their invasion-of-privacy claims.  See Express One Int=l, Inc., 53
S.W.3d at 900B01 (affirming summary judgment
where claimant did not adduce evidence raising fact issue as to
invasion-of-privacy claim).

                                                         2.  Trespass to Chattels

As to the
trespass-to-chattels claim, for liability to attach, the wrongful interference
with the chattel must have caused actual damage to the property or deprived the
owner of its use for a substantial period. 
See Zapata v. Ford Motor Credit Co., 615 S.W.2d 198, 201 (Tex.
1981); Omnibus Int=l, Inc., 111
S.W.3d at 826.  Applying the familiar
standard of review, we conclude Jerome Kosoy, M.D., Beautique, Inc., Discovery
Services of Texas, Inc., and Jeffrey K. Musker, D.C. did not raise a genuine
issue of material fact in this regard. 
Accordingly, the trial court correctly granted summary judgment as to
the trespass-to-chattels claim.  See
Omnibus Int=l, Inc., 111
S.W.3d at 826.

                          3.  Negligence, Negligence Per Se, and Gross Negligence








As to the
negligence and negligence per se claims, Jerome Kosoy, M.D., Beautique, Inc.,
Discovery Services of Texas, Inc., and Jeffrey K. Musker, D.C. have not adduced
any evidence giving rise to a common-law negligence duty regarding the alleged
actionable conduct.  Furthermore, under
the negligence per se analysis established by the Texas Supreme Court, this
case does not involve a claim deriving the duty from the common law, and so, we
conclude that this is not an appropriate case for negligence per se.  See Perry v. S.N.,  973 S.W.2d 301, 306B07 (Tex.
1998).  As to the gross negligence
allegation, applying the familiar standard of review, we find no evidence that
GTE Mobilnet engaged in grossly negligent conduct.  Accordingly, the trial court correctly
granted summary judgment as to these claims.

                                                            4.  Civil Conspiracy

A civil
conspiracy is a combination by two or more persons to accomplish an unlawful
purpose or to accomplish a lawful purpose by unlawful means.  Firestone Steel Products Co. v. Barajas,
927 S.W.2d 608, 614 (Tex. 1996). The Agist of a
civil conspiracy@ is the
injury the conspirators intend to cause.  Id. 
Civil conspiracy requires specific intent.  Id. 
For a civil conspiracy to arise, the parties must be aware of the harm
or the wrongful conduct at the beginning of the combination or agreement.  Id. 
Reviewing the record under the applicable standard of review, we find no
evidence that Adverfax and GTE Mobilnet had a meeting of the minds and knew
that damage would result from sending unsolicited fax advertisements to any of
the Recipients.  Accordingly, we find the
trial court correctly granted summary judgment on this issue.  

In sum,
we conclude that the trial court correctly granted summary judgment against
Jerome Kosoy, M.D., Beautique, Inc., Discovery Services of Texas, Inc., and
Jeffrey K. Musker, D.C. as to all of their common-law claims. 

K.        Can the Recipients appeal from the trial
court=s denial of the motion for
partial summary judgment?








The
Recipients= motion for partial summary
judgment did not seek a final judgment. 
Therefore, we lack appellate jurisdiction to review the trial court=s denial
of this motion.  See CU Lloyd=s of
Texas v. Feldman, 977 S.W.2d 568, 569 (Tex. 1998) (stating
that, before a court of appeals may review an order denying a cross motion for
summary judgment not covered by an interlocutory appeal statute, both parties
must have sought final judgment in their cross motions for summary judgment,
unless an exception applies that involves declaratory relief).  Because we may not address an issue not
properly before this court, we do not consider the trial court=s denial
of the Recipients= motion
for partial judgment in this appeal.

                                                             IV. 
Conclusion

The
opt-out interpretation of the Aif
otherwise permitted@ phrase
is most consistent with the language, articulated goals, and legislative
history of the TCPA.  Therefore, the
trial court erred by impliedly granting summary judgment based on the opt-in
interpretation.  Under this same phrase,
the residual four-year federal statute of limitations does not apply when
private actions are being asserted in Texas courts; rather, Texas limitations
law applies.  Under this law, the trial
court correctly granted Chick-Fil-A summary judgment because the summary-judgment
evidence proved as a matter of law that Chick-Fil-A did not send any allegedly
unsolicited fax advertisement to any of the Recipients within the two-year
period before the Recipients sued Chick-Fil-A in this case.  However, the trial court erred in granting
summary judgment in favor of GTE Mobilnet based on limitations.  The trial court also erred by impliedly
finding the TCPA applies only to interstate fax advertisements and by impliedly
granting summary judgment based on the Advertisers= constitutional
arguments. There is a genuine issue of material fact as to whether GTE Mobilnet
sent unsolicited fax advertisements to appellants Jerome Kosoy, M.D.,
Beautique, Inc., Discovery Services of Texas, Inc., and Jeffrey K. Musker, D.C.  The trial court properly granted summary
judgment regarding the Recipients=
common-law claims.  This court has no
jurisdiction to review the trial court=s denial
of the Recipients= motion
for partial summary judgment.  








Because
the trial court correctly granted summary judgment as to the Recipients=
common-law claims, all of their claims against appellee Chick-Fil-A, Inc., and
the claims of The Chair King, Inc., Chair King, S.A., Inc., M.E. Ford and
Associates, Vantage Shoe Warehouse, Inc., Counselor Systems, Inc., Pope and
Booth, P.C., and Pope Escrow Company under the TCPA, we affirm these rulings.  However, we reverse the trial court=s
judgment as to the TCPA claims of appellants Jerome Kosoy, M.D., Beautique,
Inc., Discovery Services of Texas, Inc., and Jeffrey K. Musker, D.C. against
appellee GTE Mobilnet, and we remand these claims for further proceedings
consistent with this opinion.  We order
the Recipients to pay any costs of appeal that have been incurred by
Chick-Fil-A.  Based on our holdings, we
find good cause to apportion the costs of appeal incurred by the Recipients and
GTE Mobilnet equally between the Recipients and GTE Mobilnet.  See Tex.
R. App. P. 43.4. Therefore, for good cause and in the interest of
justice, we order the Recipients and GTE Mobilnet each to pay one-half of the
aggregate appellate costs incurred by these parties in this case. 

 

 

/s/        Kem Thompson Frost

Justice

 

Judgment rendered and
Substitute Opinion filed May 6, 2004.

Panel
consists of Justices Yates, Hudson, and Frost.

 

 











[1]  In their
appellate briefs, all parties assert that Athis
case is not complicated.@ The clerk=s record
in this summary-judgment appeal contains more than 14,700 pages.  Taken together, the parties= appendices exceed 740 pages.  In over 230 pages of appellate briefing, the
parties have addressed more than a dozen legal issues, including one of
apparent national first impression. 





[2]  After the
Recipients filed suit against AdverFax, AdverFax ceased its operations.  





[3]  The Recipients brought their claims
seeking class-action certification for both a plaintiffs= class and a defendants= class.  The trial court did not rule on the
class-certification issue, and that issue is not before this court.  





[4]  The Texas
Legislature did enact such a statute, and it took effect on September 1,
1999.  See Act of May 26, 1999,
76th Leg., R.S., ch. 635, '' 1B3, 1999 Tex. Gen Laws 3203 (codified at Tex. Bus. & Comm. Code ' 35.47(c)B(g)).  However, this statute does not apply to
communications made before September 1, 1999. 
See id. at '' 2, 3.





[5]  If an agency
responsible for implementing the TCPA has interpreted the statutory language at
issue, then the reviewing court gives deference to that agency=s reasonable interpretation of the relevant language. See
United States v. Mead Corp., 533 U.S. 218, 227B28, 121 S. Ct. 2164, 2171B72, 150 L. Ed. 2d 292 (2001).  As explained below, we find that the Federal
Communications Commission has not interpreted the language at issue in this
case, so this aspect of the standard of review does not apply to this case.





[6]  In support of
their argument in this regard, the Advertisers also have cited an unpublished
ruling by a United States District Court that state legislation authorizing
TCPA damage claims is required before 
claimants in that state may file suit.  See Nicholson v. Hooters of Augusta, Inc.,
136 F.3d 1287, 1288 (11th  Cir. 1998)
(describing district court Aopt-in@ ruling), modified in part by 140 F.3d 898
(11th Cir. 1998).  However, this ruling
was vacated by the United States Court of Appeals for the Eleventh Circuit,
which held that federal courts have no subject-matter jurisdiction over private
damage claims under the TCPA.  See
id. at 1290.  The Advertisers also
cite dicta in Murphey v. Lanier, in which the Ninth Circuit, in the
course of finding no federal jurisdiction over private damage claims under the
TCPA, states that these claims can be litigated in state court only if the state
consents. See 204 F.2d 911, 914 (9th Cir. 2000).





[7]  We note that
at least one commentator has asserted that the Texas Legislature enacted the
1999 amendments to section 35.47 of the Texas Business and Commerce Code
because Texas consumers had complained to the legislature that there was
uncertainty about whether TCPA damage actions could be brought in Texas courts,
rather than because it was considered necessary.   See Biggerstaff, supra, at 409
n.10.





[8]   Statutes duly
enacted by the United States Congress are as much laws in Texas as statutes
enacted by the Texas Legislature.  See
Howlett v. Rose, 496 U.S. 356, 367B69, 110
S. Ct. 2430, 2438B39, 110 L. Ed. 2d 332 (1990).  Texas law and federal law form one system of
jurisprudence, which together constitutes the law of the land for Texas.  See Howlett, 496 U.S. at 367B69, 110 S. Ct. at 2438B39.  Under the Supremacy Clause of the United
States Constitution, the United States Constitution and duly-enacted federal
statutes are Athe supreme Law of the Land,@ and Texas courts have a responsibility to enforce
that law according to their ordinary procedural rules.  See U.S.
Const., art. VI, cl. 2; Howlett, 496 U.S. at 367B69, 110 S. Ct. at 2438B39. 





[9]  The same
commentator suggests that if there are any constitutional problems relating to
the acknowledgment interpretation arguably effecting a federal commandeering of
state resources, these problems can be avoided by holding that federal courts
and state courts have concurrent jurisdiction over private TCPA damage claims.  See Biggerstaff, supra, at
446.  This option is not available to
this court because the Fifth Circuit already has determined that no federal
jurisdiction is available to the Recipients. See Chair King, Inc., 131
F.3d at 514.  In any event, finding
federal jurisdiction in this regard would be contrary to the holding of every
federal court of appeals that has addressed this issue and would not result in
a correct ruling.





[10]  Even if the
Advertisers had asserted this ground in the trial court, there would be no
merit in it, because the 1989 unsolicited fax statute does not constitute an
opting out of private damage claims under the TCPA, which was enacted in
1991.  See Condon, 855 So. 2d at
648 (holding Florida did not Aopt out@ of TCPA
by, prior to enactment of TCPA, passing statutes regulating unsolicited fax
advertisements without allowing for private damage claims); Hooters of
Augusta, Inc., 537 S.E.2d at 471B72 (same
for Georgia); but see R.A. Ponte Architects, Ltd., 815 A.2d at 827
(holding Maryland opted out of TCPA by, prior to enactment of TCPA, passing statutes
regulating unsolicited fax advertisements without allowing for private damage
claims).  





[11]  The
Advertisers assert that this scienter argument was a separate summary-judgment
ground that the Recipients did not attack on appeal; however, we conclude that
the Recipients sufficiently assigned error in this regard in the First
Amendment section of their appellate brief. 





[12]  The
Advertisers have not addressed their equal-protection challenge on appeal.





[13]  GTE Mobilnet
also cites a second affidavit from Sicard that was filed in response to the
Recipients= motion for partial summary judgment.  Sicard=s first
affidavit already raises a fact issue, and that fact issue cannot be erased by
Sicard filing a second affidavit. Further, it is not clear that the second
Sicard affidavit speaks to GTE Mobilnet at all because it defines AGTE Mobilnet@ in a
way that seems to refer to GTE Mobilnet of South Texas Limited Partnership
rather than to defendant/appellee GTE Mobilnet of Houston Inc. Although the
second affidavit does state that the fax advertisements were not sent by AGTE Mobilnet@ or on
its behalf or at its request, this statement alone is conclusory and
insufficient to support summary judgment in favor of GTE Mobilnet. See
Anderson v. Snider, 808 S.W.2d 54, 55 (Tex.1991).  Lastly, although the second affidavit states
that the fax advertisements in question appear to have been sent by independent
contractors, this is not sufficient to entitle GTE Mobilnet to summary
judgment. See Worsham, 772 A.2d 868, 877B79; Hooters of Augusta, Inc., 537 S.E.2d at
472.